FON S. LEONG and EILEEN LEONG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leong v. Commissioner
Docket No. 157-74.
United States Tax Court
T.C. Memo 1977-19; 1977 Tax Ct. Memo LEXIS 417; 36 T.C.M. (CCH) 89; T.C.M. (RIA) 770019; January 31, 1977, Filed *417 Eugene O. Cobert, for the petitioners. Richard M. Campbell, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Additions
to tax Year
Income tax
(Sec. 6653(a)) [1]
1968
$26,161.03
$1,308.05
1969
24,685.21
1,234.26
The questions before us are: (1) whether petitioners had unreported income for each of the years in question in the amounts reconstructed by respondent based upon net deposits to their bank and brokerage accounts and (2) if any such amounts were income, whether petitioners are liable for the additions to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated by the parties and are incorporated herein by this reference. Petitioners (hereinafter sometimes referred to as Fon and Eileen, respectively) are husband and wife who resided in New York, New York, at the time of filing their petition herein. They timely filed joint *418 income tax returns for 1968 and 1969 as cash basis taxpayers. During the years in question, petitioners operated a restaurant located on Mott Street in New York City. The restaurant was one flight above street level and could seat between 40 and 50 diners at nine tables. Fon was the chef and was involved in the daily operation of the business, which was open seven days a week. Eileen assisted as a cashier during busier hours. In addition, she tallied the daily receipts of the business from customer checks that her husband brought home to her each evening. Eileen was born and educated in the United States; she graduated from high school, where she pursued a commercial program. Her prior work experience included a job as a bookkeeper at a New York bank. Based upon the records kept by Eileen for the restaurant, petitioners' accountant prepared petitioners' income tax returns. For the years in question, petitioners reported income from the following sources: 1968
1969
Net profit from restaurant
$13,223.75
$13,282.05
Dividends [1]
1,707.37
1,537.62
Interest
2,712.50
2,891.47
Net gain (or loss) from sale
or exchange of property [2]
24,682.96
(2,249.98)
*419 During 1967, 1968, and 1969, petitioners purchased and sold securities. Most of petitioners' gross receipts from the restaurant, as reported on their tax returns, were deposited in their business bank account at the Chemical Bank New York Trust Company. [2] They reported $55,899.95 of such gross receipts for 1968 and $67,713.05 for 1969. During the taxable year 1968, petitioners maintained 10 savings and brokerage accounts (excluding the aforementioned business account) and one personal checking account, with respect to which they had deposits aggregating $194,525.18, withdrawals aggregating $146,632.06, and net deposits (excess of aggregate deposits over aggregate withdrawals) in the amount of $47,893.12.The comparable amounts for the taxable year 1969 were $180,364.75, $133,092.52, and $47,272.23 in respect of 18 savings and brokerage accounts (excluding their business account) and the one personal checking *420 account. The bulk of the withdrawals from the personal checking account represented payments to the various brokerage accounts. Neither the gross receipts of petitioners' restaurant nor petitioners' gross receipts from the sale or exchange of property as reported on their 1968 or 1969 tax returns were the source of any of the deposits to bank and brokerage accounts in 1968 and 1969, respectively. [3]
In addition to their bank and brokerage accounts, petitioners maintained one safe deposit box at the Trade Bank and Trust Company during 1967, 1968, and 1969. In January, 1967, Ping Chung Leong (Ping Chung), a relative of Fon, [4] emigrated from Hong Kong to the United States. On his visa application, Ping Chung represented that he had no personal financial resources and would be supported by his father-in-law in the United States. He had not seen Fon between 1949, when Fon *421 came to the United States from Hong Kong, and some time after his arrival in the United States in 1967. Ping Chung resettled in New York with his wife and two children to be near his wife's parents. Rosita Fu (Rosita) moved from Hong Kong to the United States in 1965. After her arrival that year, she met and became a friend of Eileen. In 1969, Rosita returned to Hong Kong to visit her mother. Both Ping Chung and Rosita were knowledgeable about business affairs and the practice of banking money. Ping Chung had been a newspaper reporter and had engaged in the import-export business in Hong Kong; he had maintained a safe deposit box, a checking account, and a savings account there. Rosita had graduated from college in Hong Kong; she was a legal secretary there and had some experience with real estate investments. Upon her arrival in the United States, she took a job as a legal secretary in New York. Thereafter, she worked for an insurance company. Respondent determined that petitioners' net banking and brokerage account *422 deposits for 1968 and 1969 (see p.5, supra) constituted unreported income. OPINION Initially, petitioners argue that respondent's resort to the bank deposits method of income reconstruction was improper since their own books and records comport with their income as reported for the years at issue. Their point is not well taken. The internal consistency of a taxpayer's books does not necessarily establish their accuracy. See ; , affg. per curiam . Nor is respondent required, as petitioners contend, to establish a likely source of income; whatever may be the ground rules in respect of respondent's responsibilities in net worth cases, it does not extend to situations where the bank deposits method is used. As we stated in -- [where], as here, a taxpayer has made numerous and comparatively large deposits in a bank account, the sources and nature of which are not recorded or accounted for in any books of account, the Commissioner's determination *423 of income and of deficiencies in tax thereon by reference to such deposits has been approved in numerous cases. It is, of course, true that the existence of bank deposits, although not explained or accounted for in a satisfactory manner, does not of itself show that the sums deposited were or were not income. But where the Commissioner has determined that they were, the taxpayer has the burden of showing that the determination was wrong. , certiorari denied ; ; , certiorari denied , affirming ; ; ; ; and , affirmed per curiam . [Emphasis added.] See also . Nor are we required to take a different view because respondent utilized the net bank deposits method *424 rather than resting his determination on specific individual deposits. Cf. . Granted that the former method is less precise than the latter, there is nevertheless sufficient specificity to avoid the vagaries often present in a net worth case (see ). Moreover, since petitioners have chosen to rest their case on a specific explanation of the source of the net deposits, namely funds entrusted to them by friends (see pp. 10, et seq., infra), we need give no more than passing attention to the fact that it may have been unlikely that the restaurant business could have generated the substantial amounts represented by deposits. [5] At best, any such lack of income-generating capacity would be corroborative evidence to support the petitioners' claimed sources of the funds. *425 We now turn to petitioners' substantive contention regarding the source of the net deposits -- namely, the single explanation [6] that such deposits represented funds which were entrusted to petitioners by Ping Chung and Rosita, both of whom testified at the trial herein. The following represents a summary of their testimony as well as that of each of the petitioners: 1968 deposits: In January 1967, Ping Chung immigrated to New York from Hong Kong. Notwithstanding his representation on his visa application that he had no financial resources, he and his family carried some $80,000 with them on the trip from Hong Kong in shirt pockets, handbags, and the like. The day after arriving in New York, Ping Chung brought $50,000, in $100 bills, in a paper bag to Fon for "safekeeping". The transaction was not evidenced by any writing. Ping Chung's reason for committing his cash for "safekeeping" was to protect his resources while Fon helped him look for a restaurant in which to invest. He did not care if or how petitioners used such money, or if they used it for their own benefit, and he expected no return on his money by way of interest or otherwise; nor did he expect to participate *426 in any gains or losses from the use of the money. Ping Chung and Fon had an oral understanding that the latter's only obligation was to return the $50,000 upon demand. Petitioners initially stored the cash in a metal box which they placed in a dresser drawer in their apartment so that the money would be readily available if Ping Chung needed it in a hurry. A short while later, they transferred one-half of the cash to their safe deposit box. For eleven months months in 1967, petitioners held this money for "safekeeping," and refrained from using any or most of it for their own benefit because of Ping Chung's potential needs. They did, however, invest the money for their own account *427 throughout 1968. [7]
1969 deposits: In February, 1969, Rosita returned to her home in New York after visiting her mother in Hong Kong. She brought with her $50,000 of her mother's money [8] to invest in this country. Like Ping Chung, Rosita entrusted this money to petitioners for "safe-keeping." Rosita and Eileen were exploring the possibility of using these funds for real estate investment. The terms of the arrangement with Rosita were identical to those of the arrangement between petitioners and Ping Chung. The cash was stored in the same manner as that received from Ping Chung. Soon after receiving this money, Eileen began investing it for her own benefit and this cash was the source of petitioners 1969 bank and brokerage account deposits. The testimony of petitioners, Ping Chung, and * Rosita was fraught with inconsistencies. For example, there was conflicting *428 testimony concerning the circumstances in which Ping Chung initially handed his bagful of cash to Fon, whether petitioners used any of Ping Chung's money for investment in 1967, and the circumstances attending Rosita's transfer of cash. While petitioners herein contend that all of the deposits in issue derived from "safekeeping" funds, Eileen testified that only petitioners' own funds, the source of which remains unexplained, were placed in petitioners' savings accounts. Finally, the record fails to reveal that either the restaurant investment possibility as to Ping Chung or the real estate investment possibility as to Rosita was ever seriously pursued. It is against the foregoing background that we proceed to discharge the classic task of the trier of facts, namely, the evaluation of the credibility of witnesses (whom we saw and observed, see , affg. , in the elusive search for truth. See .In making such an evaluation, we need not accept their testimony as gospel, even though it is not controverted; we *429 are entitled to take into account whether it is improbable, unreasonable, or questionable. See ; ; , affg. per curiam ; ; . We have concluded that the explanation advanced by petitioners has a hollow ring and should not be accepted. To hold otherwise would strain credulity beyond any reasonable limits, even if we accept the premise that persons of petitioners' background and that of Ping Chung and Rosita might engage in financial transactions in a manner foreign to Western style. [9] We simply cannot believe that Ping Chung and Rosita, who were not without some financial sophistication, [10] each gave $50,000 to petitioners for safe storage in a dresser drawer or for petitioners to use freely as they saw fit. [11]
*430 In short, we hold that petitioners have failed * to carry their burden of proving that respondent's determination is erroneous. To the extent they have underpaid their tax for 1968 and 1969, petitioners have introduced no evidence as to why an addition to tax under section 6653(a) should not be imposed. Therefore, respondent's determination in this regard is sustained. See . Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
1. Before any statutory exclusion and exclusive of nontaxable dividends. A portion of cash receipts was utilized directly for restaurant expenses.
[2]↩ Before any segregation of short-term and long-term gain and before any deduction for long-term capital gain.
3. There is no specific evidence on the record before us from which we could likewise conclude that none of the reported interest or dividend income is reflected in the figures. However, at trial, petitioners' counsel conceded that there was no "overlapping," albeit in a somewhat different context.↩
4. Fon and Ping Chung use the word "cousin" to describe each other, not as blood relatives, but as being members of the same family grouping.↩
5. Petitioners merely assert that their restaurant was incapable of generating additional receipts and fault respondent for not pointing to another likely source. The fact of the matter is that respondent has introduced figures showing that it was not impossible for petitioners' restaurant to generate such receipts. This could have occurred through the generation of additional restaurant income not recorded on customer checks or, if so recorded, not brought home to Eileen or, if brought home, simply not tallied.↩
6. Petitioners have not contended that any of the deposits in question came from any prior accumulations or from loans or gifts by other persons. They also concede that none of such deposits came from either the restaurant income or proceeds of the sales of securities reported on their tax returns for the years in question. Moreover, since respondent's determination only included net↩ deposits, any inter-account transfers have been automatically eliminated; petitioners do not contend otherwise.
7. These funds were allegedly the sole source of the 1968 bank and brokerage account deposits in issue; petitioners' concerns for any fiduciary responsibility and liquidity had thus apparently been dissipated by this time.↩
8. Rosita testified that her mother collected U.S. dollars in Hong Kong as a hobby.↩
9. Compare . ↩
10. See pp. 6-7, supra↩. 11. See . We also note that prior to the issuance of a notice of deficiency to petitioners, none of the allegedly entrusted funds had been returned to either Ping Chung or Rosita. Thereafter, petitioners issued one $10,000 check to the order of Ping Chung and two $5,000 checks to the order of Rosita. Even if the record were clear that the funds represented by these checks ended up in the hands of the payees (which it is not), the timing of such repayments would be suspect. See , affg. on this point ; Regensburg v. * ↩.